**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

**MUTTAQIN FATIR ABDULLAH,**              :

    **Plaintiff**                                        :

          **v.**                                        :

**LT. SEBA, et al.,**                                    :

    **Defendants**                                  :

**CIVIL ACTION NO. 3:13-1227**

**(JUDGE MANNION)**

**MEMORANDUM**

## I.  Background

Plaintiff, Muttaqin Fatir Abdullah, an inmate confined in the United

States Penitentiary, Lewisburg, ("USP-Lewisburg"), Pennsylvania, filed the

above captioned Bivens[1] action pursuant to 28 U.S.C. §1331. (See Doc. 1,

complaint). He names as Defendants the following USP-Lewisburg

employees: Jason Seeba[2], Lieutenant; Gregory George, Emergency Medical

Technician, and Beverly Prince, National CPR Coordinator. Id. Plaintiff alleges

that on April 17, 2011, he and his cell mate were "placed in 24 hrs restraints

with belly chains pulled around our chest so tight that [Plaintiff] could barely

breath, or eat [his] meals" and "the restraints were so tight that is cause both

_____

[1]Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics, 403
U.S. 388, 397 (1971).

[2]The correct spelling of this Defendant's name is "Seeba". (See Doc. 35-
2 at 89, Declaration of Jason Seeba).

of [Plaintiff's] hands to swell up so bad that they look like [he] had on boxing gloves", resulting in "ulner nerve damage in [Plaintiff's] left hand." Id. at 2. Plaintiff claims that Defendant, Nurse George "did tell Lt. Seba to loose the chains from around [Plaintiff's] chest, but Lt. Seba refuse to loose the restraints from around [Plaintiff's] wrists where [he] has ulner nerve damage in [his] left hand from the restraints." Id. at 3.

Plaintiff further claims that on April 19, 2011, Nurse Prince came to Plaintiff's cell and "observe the swelling in [his] hands, and refuse to tell the Lt. to loose the restraints from around [his] writs." Id.

On May 6, 2013, Plaintiff filed the instant action in which he seeks ten million dollars in damages. Id. at 4. On June 7, 2013, Plaintiff filed a document entitled "Medical Complaint" (Doc. 10).

Presently before the Court is Defendants' motion to dismiss and motion for summary judgment. (Doc. 28). Defendants' motion is directed at both the original complaint, (Doc. 1) and the Plaintiff's "Medical Complaint". [3] (Doc. 10).

---

[3]Because this document was filed within twenty-one (21) days of service of the original complaint, Defendants have construed such filing as an amendment, in accordance with Fed.R.Civ.P. 15(a)(1). Subsequent to the filing of this document, Plaintiff has filed numerous documents entitled "Complaint" or "Amended Complaint". (See Docs. 11, 16, 20, 22, 24, 29, 30). However, Plaintiff has never properly sought leave to file an amendment pursuant to Fed.R.Civ.P. 15(a)(2). Moreover, these subsequent "amended (continued...)

The motion has been fully briefed and is ripe for disposition. For the reasons that follow, Defendant's motion for summary judgment will be granted.

## II.   Standards of Review

### A. Bivens Standard

Plaintiff's claims are filed pursuant to 28 U.S.C. §1331, in accordance with Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics, 403 U.S. 388, (1971). Under Bivens, the District Court has federal question jurisdiction pursuant to 28 U.S.C. §1331 to entertain an action brought to redress alleged federal constitutional or statutory violations by a federal actor. Bivens, supra. Pursuant to Bivens, "a citizen suffering a compensable injury to a constitutionally protected interest could invoke the general federal question jurisdiction of the district court to obtain an award of monetary damages against the responsible federal official." Butz v. Economou, 438 U.S. 478, 504 (1978). A Bivens-style civil rights claim is the federal equivalent of an action brought pursuant to 42 U.S.C. §1983 and the same legal principles have been held to apply. See, Paton v. LaPrade, 524 F.2d 862, 871

---

[3](...continued)
complaints" raise claims that do not relate back to the original complaint, nor are they complete to stand on their own.

(3d Cir. 1975); Veteto v. Miller, 829 F.Supp. 1486, 1492 (M.D.Pa. 1992);

Young v. Keohane, 809 F.Supp. 1185, 1200 n. 16 (M.D.Pa. 1992). In order

to state an actionable Bivens claim, a plaintiff must allege that a person has

deprived him of a federal right, and that the person who caused the

deprivation acted under color of federal law. See West v. Atkins, 487 U.S. 42,

48 (1988); Young v. Keohane, 809 F.Supp. 1185, 1199 (M.D.Pa. 1992);

Sharpe v. Costello, 2007 WL 1098964, *3 (M.D.Pa., 2007).

**B. Motion to Dismiss**

Defendants' pending dispositive motion is supported by evidentiary

materials outside the pleadings. Federal Rule of Civil Procedure 12(d)

provides in part as follows:

> If, on a motion under Rule 12(b)(6) or 12(c), matters outside the
> pleading are presented to and not excluded by the court, the
> motion must be treated as one for summary judgment under Rule
> 56. All parties must be given reasonable opportunity to present all
> the material that is pertinent to the motion.

Fed.R.Civ.P. 12(b)(d).

This Court will not exclude the evidentiary materials accompanying the

Defendants' motion. Thus, their motion will be treated as solely seeking

summary judgment. See Latham v. United States, 306 Fed. Appx. 716, 718

(3d Cir. 2009) (when a motion to dismiss has been framed alternatively as a

motion for summary judgment such as in the present case, the alternative filing "is sufficient to place the parties on notice that summary judgment might be entered.")

### C. Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56(a) "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original).

A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. Anderson, 477 U.S. at 248; Gray v. York Newspapers, Inc., 957 F.2d 1070, 1078 (3d Cir. 1992). An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson, 477 U.S. at 257; Brenner v. Local 514, United Brotherhood of

Carpenters and Joiners of America, 927 F.2d 1283, 1287-88 (3d Cir. 1991).

When determining whether there is a genuine issue of material fact, the court must view the facts and all reasonable inferences in favor of the nonmoving party. Moore v. Tartler, 986 F.2d 682 (3d Cir. 1993); Clement v. Consolidated Rail Corporation, 963 F.2d 599, 600 (3d Cir. 1992); White v. Westinghouse Electric Company, 862 F.2d 56, 59 (3d Cir. 1988). In order to avoid summary judgment, however, parties may not rely on unsubstantiated allegations. Parties seeking to establish that a fact is or is not genuinely disputed must support such an assertion by "citing to particular parts of materials in the record," by showing that an adverse party's factual assertion lacks support from cited materials, or demonstrating that a factual assertion is unsupportable by admissible evidence. Fed.R.Civ.P. 56(c)(1); see Celotex, 477 U.S. at 324 (requiring evidentiary support for factual assertions made in response to summary judgment). The party opposing the motion "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 586 (1986). Parties must produce evidence to show the existence of every element essential to its case that they bear the burden of proving at trial, for "a complete failure of proof concerning an essential element of the nonmoving

6

party's case necessarily renders all other facts immaterial." Celotex, 477 U .S. at 323; see Harter v. G.A.F. Corp., 967 F.2d 846, 851 (3d Cir.1992). Failure to properly support or contest an assertion of fact may result in the fact being considered undisputed for the purpose of the motion, although a court may also give parties an opportunity to properly provide support or opposition. Fed.R.Civ.P. 56(e).

## III.   **Statement of Facts**[4]

On April 17, 2011, a calculated use of force was approved by the Warden of USP-Lewisburg in order to place Abdullah in ambulatory restraints after he refused to give staff his food tray and displayed signs of imminent

---

[4]Middle District of Pennsylvania Local Rules of Court provide that in addition to filing a brief in response to the moving party's brief in support, "[t]he papers opposing a motion for summary judgment shall included a separate, short and concise statement of material facts responding to the numbered paragraphs set forth in the statement [of material facts filed by the moving party] ..., as to which it is contended that there exists a genuine issue to be tried." See M.D. Pa. LR 56. 1. The rule further states that the statement of material facts required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party. See id. Because Plaintiff has failed to file a separate statement of material facts controverting the statement filed by Defendants, all material facts set forth in Defendants' statement (Doc. 35) will be deemed admitted.

violence by threatening to assault staff. (Doc. 35-2 at 87, Declaration of Jason Seeba, USP-Lewisburg Lieutenant). Upon arrival of the team, Abdullah submitted to restraints and was removed from his cell. (Doc. 35-1 at 4, Declaration of Dr. Kevin Pigos, USP-Lewisburg Clinical Director). Abdullah was removed from his cell, and escorted to the shower, where he was visually searched. Id. The Plaintiff was placed in ambulatory restraints at approximately 8:48 a.m., and was escorted to D-block without further incident. (Doc. 35-2 at 87, Declaration of Jason Seeba, USP-Lewisburg Lieutenant).

On April 17, 2011 at 8:42 a.m., EMT Bryan Walls completed a Bureau of Prisons Health Services Clinical Encounter on Plaintiff, which reflects the following:

> I/M was subject of a Calculated Use of Force. On arrival of the team, he submitted to restraints and was removed from cell J-313. He was taken to the shower area, stripped, and visually searched. He was then re-dressed and ambulatory restraints were applied. Circulation and motor function were intact distal to the restraints after application. He was escorted to cell D-126 where he remained in ambulatory restraints. I/M offered no medical complaints and did not sustain any injuries during this Calculated Use of Force. I/M stated he was on Coumadin due to circulation problems in his L leg.

(Doc. 35-1 at 16, Bureau of Prisons Health Services Clinical Encounter).

Beginning at 10:00 a.m., restraint checks were conducted by a lieutenant every two hours. (Doc. 35-2 at 88, Declaration of Lieutenant Jason

Seeba). On April 17, 2011, Lt. Seeba conducted restraint checks on Abdullah at 4:00 p.m., 6:00 p.m., and 10:00 p.m. Id. Also, restraint reviews were conducted by health services twice during each eight-hour shift. (See Doc. 35-1 at 18-27, Bureau of Prisons Health Services Clinical Encounters). During the approximate 24 hour period that Plaintiff was in ambulatory restraints, he continued to be disruptive, defiant and verbalized he would not be compliant if he was removed from restraints. (Doc. 35-2 at 88, Declaration of Lieutenant Jason Seeba).

At the 12:00 p.m. check EMT Walls noted the following:

I/M offered no medical complaints. He stated: "This is unconstitutional." He refused to move his extremities and stated staff "should loosen this shit up or get out". Refusal form generated.

(Doc. 35-1 at 18, Bureau of Prisons Health Services Clinical Encounter).[5]

Paramedic George conducted restraint review checks at 4:00 p.m., 6:00 p.m. on April 17, 2011, and at 12:00 a.m. on April 18, 2011. (See Doc. 35-1 at 18-30). At his 12:00 a.m. check, Paramedic George noted swelling in

---

[5]EMT Walls counseled Plaintiff on the possible consequences of failing to comply with accepting medical treatment and the medical advice of moving his extremities. Id. Plaintiff refused both and then refused to sign the Medical Treatment Refusal form, reflecting same. (See Doc. 35-1 at 21, Medical Treatment Refusal).

Plaintiff's hands, stating "[t]he inmate continues to manipulate the restraints which is causing the swelling." Id. Abdullah was educated that continued manipulation of the restraints was causing the swelling. Id. At no time did Paramedic George recommend adjustment of Abdullah's ambulatory restraints because of circulation or other medical concerns. Id.

On April 18, 2011, Nurse Hartzel conducted a restraint review check at 6:00 a.m, and EMT Beverly Prince conducted a restraint review check at 8:00 a.m. (Doc. 35-1 at 31-36, Bureau of Prisons Health Services Clinical Encounter). At no time did Plaintiff offer any medical complaints, nor was there any sign of apparent distress. Id. Both Nurse Hartzel and EMT Prince found his restraints to be adequate with regard to circulation. Id. No injuries were noted. Id.

Abdullah was maintained in ambulatory restraints for approximately 24 hours because he continued to be disruptive, defiant, and verbalized that he would not be compliant if he was removed from restraints. (Doc. 35-2 at 88, Declaration of Lieutenant Jason Seeba). Id. ¶ 9.

On April 19, 2011, Abdullah was seen during sick call with complaints that his hands are numb and he does not have any circulation in them. (Doc. 35-1 at 37, Bureau of Prisons Health Services Clinical Encounter). He also

stated at that he was "in restraints over the weekend" and "that was unconstitutional." Id. It was noted that Abdullah refused to move his extremities during one restraint check and that he had strong bilateral pulses and was able to move his fingers and toes during the other restraint checks. Id. He was advised that the symptoms should improve within 7-10 days, and to return to clinic if symptoms persist or worsen. Id.

On April 27, 2011, Abdullah was again seen during sick call. (Doc. 35-1 at 40, Bureau of Prisons Health Services Clinical Encounter). He again complains that his recent episode of being in restraints was unconstitutional, asking "Isn't there anything you can do so that this doesn't happen again?". Plaintiff relayed that his hands have improved somewhat, but that his left hand is still numb. Id. He requested to see another doctor, stating that "it could be my circulation." Id. He denied any pain. Id.

On May 1, 2011, EMT Bryan Walls completed the following Bureau of Health Services Encounter:

> I/M stopped this provider during AM pill line/sick call. He c/o his hands being numb since he was placed in restraints on 04/17. He placed blame with this provider for not having Lt. loosen the restraints when he was first placed in them stating that they cut off the circulation and he now has permanent damage because of it. When asked if he spoke with his PA about the issue, he stated "The PA said it would be better in 7-10 days. Then he said it might be a few weeks. It's been a week and it's not back yet. I

> can't even pick up a pencil to put in paperwork. What are you gonna do about it?". While he was explaining this, he bent his fingers slightly to demonstrate that he was having difficulty moving them. I/M was referred back to his PA for continuation of care. He was belligerent, "I see how this is gonna go." He then demonstrated fine motor function by opening his med envelope. He squeezes the sides with one hand while pinching the top of the envelope and sliding the 2 sides of the opening in opposition directions with his other hand to open the end of the envelope.

(Doc. 35-1 at 43, Bureau of Prisons Health Services Clinical Encounter).

On May 3, 2011, Abdullah was seen for a follow-up encounter. (Doc. 35-1 at 37, Bureau of Prisons Health Services Encounter). Abdullah relayed that at the time he was placed in restraints, he felt they were too tight. Id. Specifically, he stated that the swelling and pressure from the restraints caused a loss of adequate blood flow to his wrist/hand, particularly his left hand. Id. After the restraints were removed, he stated that his left hand was numb and did not work properly, and that he has difficulty holding a pencil or grip objects with his left hand because he is unable to extend his fingers. Id. He also complained of tissue tension and continued swelling in his palmar region. Id. Following examination, a circumferential scab was noted around the left wrist and less pronounced around the right wrist; and Plaintiff was noted as having a weakness of his left hand muscles, loss of strength, and loss of adduction of fingers and flexion of the EPL (positive Froment's sign).

Id. Abdullah was prescribed medication for pain and consultations for an EMG and an orthopedic consultation were submitted on an expedited basis for peripheral nerve injury. Id.

On May 4, 2011, referrals were approved by the Utilization Review Committee ("URC"), permitting Abdullah to be evaluated by an orthopedist and specialist for a "lower ulnar nerve injury (L)." (Doc. 35-1 at 54-55, Utilization Review Committee Referral).

On or about May 24, 2011, Abdullah was seen by consulting orthopedist, David J. Ball, D.O. (Doc. 35-1 at 58-61). Dr. Ball noted that Abdullah complained of an inability to extend his fingers, a decrease in sensation in all digits and decreased grip strength in his left hand. Id. He also complained of a decrease in sensation in 2-3 fingers on his right hand. Id.

Following his examination, Dr. Ball sought to rule out neuropathy and recommended the following: (1) conduct electromyography ("EMG") of the upper extremities; (2) Medrol dose pack as an anti-inflammatory; and (3) reevaluate Abdullah after the electromyography. Id.

On May 25, 2011, a consultation request was approved by the URC and Abdullah was referred to an orthopedist to rule out neuropathy. (Doc. 35-1 at 62, Utilization Review Committee Referral).

13

On May 25, 2011, an EMG was conducted by John Rice, M.D., of Evangelical Medical Services Organization. (Doc. 35-1 at 63-66). Dr. Rice prepared a report and noted that the nerve conduction testing of the upper extremities is abnormal, demonstrating:

1.   Left ulnar neuropathy of significant degree. There does appear to be ulnar neuropathy at elbow level; however, motor response is with depression of amplitude distal to elbow field consistent with ulnar dysfunction in forearm.

2.   Left median mononeuropathy proximal to wrist with substantial reduction of response amplitude indicating axonal injury pattern. There is evidence for left carpal tunnel syndrome, though median nerve dysfunction at the wrist does appear of mild degree.

3.   Left radial sensory neuropathy.

4.   The above constellation of electrophysiologic abnormalities suggests left forearm lesion affecting multiple peripheral nerves. Clinical and imagining correlation is warranted.

Id.

On June 3, 2011, Dr. Kevin Pigos, USP-Lewisburg Clinical Director, discussed the recent EEMG findings with the neurologist. (Doc. 35-1 at 67, Bureau of Prisons Health Services Clinical Encounter - Administrative Note). The neurologist indicated that the injury is not consistent with an injury involving restraint application, given that the location is far above the restraint

sites. Id. The neurologist recommended a follow up MRI of the entire left arm, brachial plexus, cervical and thoracic spine and head, with and without contrast. Id.

On June 20, 2011, Dr. Pigos spoke with an outside radiologist, and it was determined that "given the technical difficulties of the MRIs ordered, they will need to be done on separate and successive trips–Will first get brachial plexus with and without contrast. Next will get entire arm MRI with and without contrast. Third trip will be for brain/cervical/thoracic spine with and without contrast." (Doc. 35-1 at 68, Bureau of Prisons Health Services Clinical Encounter - Administrative Note).

On June 22, 2011, Abdullah was approved for referrals to radiology for MRIs of his entire left arm, brain, cervical and thoracic spine, with and without gadolinium contrast, due to loss of signal transmission throughout entire arm on the recent EMG of his left arm. (Doc. 35-1 at 69-70, Utilization Review Committee Referral).

On June 28, 2011, consulting orthopedist, Dr. Ball, examined Abdullah for complaints of tingling in his left hand and reviewed the EMG report compiled by Dr. Rice. (Doc. 35-1 at 71-75). Dr. Ball noted tingling and a good range of motion in all digits. Id. At this time, Dr. Ball recommended ulnar

nerve transposition at the left elbow and carpal tunnel release at the left wrist. Id.

On June 29, 2011, a consultation request was submitted to the URC, pending regional review. (Doc. 35-1 at 76, Utilization Review Committee Referral). The request sought a referral to an orthopedist for cubital tunnel syndrome (moderate) and carpal tunnel syndrome (mild). Id.

On June 30, 2011, Abdullah underwent an MRI of the brachial plexus. (Doc. 35-1 at 77-81). The study found no masses, suspicious enhancement, edema or other lesions involving the left brachial plexus or left cervical soft tissues. Id. There were no left axillary masses or adenopathy identified. Id.

On July 13, 2011, an Administrative Note was entered into Plaintiff's medical records after an officer observed Abdullah doing numerous pushups and pull-ups without difficulty while at recreation. (Doc. 35-1 at 82-83, Bureau of Prisons Health Services Clinical Encounter - Administrative Note).

On August 9, 2011, Abdullah underwent an MRI of his left upper extremity. (Doc. 35-1 at 85-87). The results found no focal abnormality of the left upper extremity and no mass or abnormal enhancement within the bones, muscles or along the neurovascular bundle. Id.

On August 10, 2011, Abdullah refused an MRI scan of his brain, cervical

and thoracic spine due to claustrophobia. (Doc. 35-1 at 88-89, Bureau of Prisons Health Services Consultation Request).

On August 11, 2011, an Administrative Note was entered in his medical file, noting the following:

> Given inmate's refusal of MRI on 8/10 which was the 3rd trip after he had obtained 2 previous MRIs recently and requesting Ativan before he has it done - his request to have the procedure done with this medication is not clinically indicated and is suspicious for a manipulation to obtain the medication for its side effect profile. This will be discussed with him further at his next chronic care encounter.

(Doc. 35-1 at 84).

On October 7, 2011, Abdullah received surgery for carpal tunnel syndrome on his left wrist and ulnar nerve transposition in his left arm. (Doc. 35-1 at 90-94; Doc. 35-2 at 1-7). Upon return to the institution, Abdullah stated that he did not have any pain at this time. Id. Abdullah was instructed to alert medical for excessive bleeding through the dressing. Id.

On October 8, 2011, Abdullah's dressing was checked. (Doc. 35-2 at 8-9, Bureau of Prisons Health Services Clinical Encounter - Administrative Note). Upon arrival, it was noted that the dressing was covered in blood near Abdullah's elbow. Id. The dressing was removed and the suture site cleaned and redressed. Id.

On October 11, 2011, Abdullah was evaluated for pain in his arm from the surgery. (Doc. 35-2 at 10-12, Bureau of Prisons Health Services Clinical Encounter). Abdullah was prescribed ibuprofen for pain. Id.

On October 13, 2011, Abdullah was seen for a follow-up encounter. (Doc. 35-2 at 13-16, Bureau of Prisons Health Services Clinical Encounter). Following examination of the suture sites, a consultation for a followup appointment with Dr. Ball was submitted. Id.

On October 14, 2011, Abdullah's bandage was changed after he got it wet while in the recreation yard. (Doc. 35-2 at 17-18, Bureau of Prisons Health Services Clinical Encounter - Administrative Note). There was no sign of infection and the staples were intact. Id.

On October 18, 2011, Abdullah's bandage was changed. (Doc. 35-2 at 19-21). No signs of infection were noted but the left elbow was noted as tense with hematoma in the upper arm, where the staples are placed. Id.

On October 20, 2011, the URC approved a referral to an orthopedist for a status post on the left carpal tunnel tendon release and the left ulnar nerve transposition. (Doc. 35-2 at 28, Utilization Review Committee Referral).

On October 20, 21 and 24, 2011, Abdullah's bandage was changed. (Doc. 35-2 at 22-27; 29-34, Bureau of Prisons Health Services Clinical

Encounter - Administrative Note). The staples and sutures were noted as intact. Id.

On October 25, 2011, Abdullah was seen for a follow-up encounter. (Doc. 35-2 at 35-38, Bureau of Prisons Health Services Clinical Encounter). Twenty-four staples and seven sutures were removed, and the sites redressed with gauze. Id.

On October 27, 2011, Abdullah was seen for a follow-up encounter. (Doc. 35-2 at 39-42). His hand wound is noted as healing well and the other wound is found to be mostly healed with some drainage. Id. At that time, Plaintiff mentioned a recurrence of hand pain. Id.

On October 28, 2011, Plaintiff's wound was cleaned and minimal drainage was noted. (Doc. 35-2 at 43-45, Bureau of Prisons Health Services Clinical Encounter).

On October 31, 2011, Abdullah's bandaged was redressed and the left elbow wound showed healing with no signs of suppuration. (Doc. 35-2 at 46-48, Bureau of Prisons Health Services Clinical Encounter).

On November 2 and 4, 2011, Abdullah's bandage was redressed. (Doc. 35-2 at 49-53, Bureau of Prisons Health Services Clinical Encounter).

On November 7, 2011, Abdullah was seen for a Chronic Care clinic at

health services for hypertension. (Doc. 35-2 at 54-58, Bureau of Prisons Health Services Clinical Encounter). At this time, he stated that he continues to have severe pain in his left arm and hand, as well as decreased mobility. Id. Examination noted that Abdullah's left wrist has reduced range of motion and that he has interosseus wasting in the left hand which is related to disuse or neuropathy. Id. Abdullah states that this had improved for him. Id.

On November 9, 2011, Abdullah was seen by Dr. Ball for a follow-up appointment. (Doc. 35-2 at 59-60, Bureau of Prisons Health Services Clinical Encounter). Dr. Ball examined Abdullah and noted he had increased sensation in his left fifth digit and that Abdullah stated the "nerve slowly getting better." Id.

On November 10, 2011, Abdullah was seen for a post-consultation visitation, where the following was noted:

> Patient seen by contract orthopedist in follow-up to his ulnar nerve transposition and carpal tunnel release. Doing better. Wound healed well. Still with some pain in 5th digit. "Slowly getting better." Requests something for pain. Will use gabapentin for a short time since he's on coumadin. Re-check pm.

(Doc. 35-2 at 61-63, Bureau of Prisons Health Services Clinical Encounter).

On February 16, 2012, following a review of Abdullah's records, the following was determined:

20

> Review of EMR indicates patient underwent ulnar nerve transposition and carpal tunnel release this past October. Well healed & released from orthopedic care.
>
> No clear indication in record for continued modification of application of hand restraints.
>
> Discussed with Clinical Director who advised to discontinue modification at this time. Will no longer be approved for rapid restraints applied end-to-end.

(Doc. 35-2 at 64-66, Bureau of Prisons Health Services Clinical Encounter - Administrative Note).

On April 17, 2012, gabapentin was confiscated from Abdullah's cell. (Doc. 35-2 at 68-69, Bureau of Prisons Health Services Clinical Encounter). This is a restricted medication which is delivered to pill line daily and the patient prescribed the medication is to ingest it immediately in front of staff. Id. Abdullah's prescription was discontinued for failure to follow pill line procedures. Id.

On June 4, 2012, the prescription for gabapentin was renewed. (Doc. 35-2 at 70-71, Bureau of Prisons Health Services Clinical Encounter).

On July 27, 2012, gabapentin and coumadin were confiscated from Abdullah's cell. (Doc. 35-2 at 72, Bureau of Prisons Health Services Clinical Encounter - Administrative Note). Both medications are restricted and delivered to pill line daily. Id. The patient prescribed the medication is to

ingest it immediately in front of staff. Id.

On July 30, 2012, the prescription for gabapentin was discontinued for the second time and renewed on August 15, 2012. (Doc. 35-2 at 72-75, Bureau of Prisons Health Services Clinical Encounter - Administrative Note). Abdullah's prescription for gabapentin was renewed on February 12, 2013, March 14, 2013, and April 12, 2013. (Doc. 35-2 at 76-82, Bureau of Prisons Health Services Clinical Encounter - Administrative Note).

On April 22, 2013, gabapentin was again confiscated from Abdullah's cell and the medication was discontinued. (Doc. 35-2 at 83-86, Bureau of Prisons Health Services Clinical Encounter - Administrative Note).

Subsequent to the April 17, 2011 use of ambulatory restraints, Plaintiff was also placed in ambulatory restraints on the following dates without any medical complaints: November 3, 2011, April 17, 2012, and March 14, 2013. (Doc. 35-1 at 12, Declaration of Dr. Kevin Pigos, USP-Lewisburg Clinical Director).


## IV.   Discussion

### A.   Constitutional Standards Governing Eighth Amendment Claims

As the United States Court of Appeals for the Third Circuit has

observed:

> The Eighth Amendment protects against infliction of "cruel and unusual punishment." However, "not every governmental action affecting the interests or well-being of a prisoner is subject to Eighth Amendment scrutiny." Whitley v. Albers, 475 U.S. 312, 319 (1986). "After incarceration, only the unnecessary and wanton infliction of pain constitutes cruel and unusual punishment forbidden by the Eighth Amendment." Id. (citation and internal quotations omitted). "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock." Id.
>
> Resolution of an Eighth Amendment claim therefore "mandate[s] an inquiry into a prison official's state of mind." Wilson v. Seiter, 501 U.S. 294, 299 (1991). Two considerations define that inquiry. We must first determine if the deprivation was sufficiently serious to fall within the Eighth Amendment's zone of protections. Id. at 298. If not, our inquiry is at an end. However, if the deprivation is sufficiently serious, we must determine if the officials acted with a sufficiently culpable state of mind. Id. In other words, we must determine if they were motivated by a desire to inflict unnecessary and wanton pain. "What is necessary to establish an 'unnecessary and wanton infliction of pain ...' varies according to the nature of the alleged constitutional violation." Hudson v. McMillian, 503 U.S. 1, 5 (1992).

Fuentes v. Wagner, 206 F.3d 335, 344-45 (3d Cir. 2000).

With these principles as the backdrop, the Court considers that individual Eighth Amendment claims advanced by Abdullah.

## 1. **Excessive Force Claims**

At the outset, Eighth Amendment excessive force claims entail a showing of some subjective intent to injure. In an excessive force case, where "prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is that set out in Whitley[v. Albers, 475 U.S. 312 (1986)]: whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Hudson v. McMillian, 503 U.S. 1, 6-7 (1992).

Thus, the keystone to analysis of an Eighth Amendment excessive force claim often entails issues of motivation–whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm. Hudson v. McMillian, 503 U.S. 1, 6-7 (1992). However, the issue of whether excessive force was used is one which, in proper circumstances, can be determined as a matter of law. In such cases, summary judgment is appropriate when "it appears that the evidence, viewed in the light most favorable to the plaintiff, will [not] support a reliable inference of wantonness in the infliction of pain." Brooks v. Kyler, 204 F.3d 102, 106 (3d Cir. 2000) (quoting Whitley, 475 U.S. at 322). There are several factors that a court examines in determining whether a correctional officer has used

24

excessive force in violation of the Eighth Amendment, including: "(1) 'the need for the application of force'; (2) 'the relationship between the need and the amount of force that was used'; (3) 'the extent of injury inflicted'; (4) 'the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of the facts known to them'; and (5) 'any efforts made to temper the severity of a forceful response.'" Id. at 106.

When considering such claims, the reasonableness of a particular use of force is often dependent upon factual context and must be "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.", 490 U.S. 386, 396-7 (1989). Moreover, in the context of prison excessive force claims, in determining "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm," Hudson v. McMillian, 503 U.S. 1, 6-7 (1992), "even if we concede [that an inmate] has established at most that prison officials over-reacted to the disturbance that he caused. . . , any such over-reaction would still fall short of supporting a finding that prison officials acted 'maliciously and sadistically to cause harm.'" Fuentes v. Wagner, 206 F.3d 335, 346 (3d Cir. 2000).

Further, in the specific factual context of excessive force claims based

upon allegations relating to a prisoner's handcuffing, courts have acknowledged that, in certain instances, government officials are entitled to qualified immunity as a matter of law. Gilles v. Davis, 427 F.3d. 197, 207 (3d Cir. 2005). With respect to these particular excessive force claims, the test for qualified immunity can be simply stated: "In these cases, summary judgment for an officer who claims qualified immunity is appropriate where, 'after resolving all factual disputes in favor of the plaintiff,[ ] the officer's use of force was objectively reasonable under the circumstances.' " Id.

### 2. **Deliberate Indifference Claims**

In order to establish an Eighth Amendment medical claim, a plaintiff must show "(i) a serious medical need, and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need." Natale v. Camden Cty. Correctional Facility, 318 F.3d 575, 582 (3d Cir. 2003). See also Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999). A serious medical need is one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that a layperson would recognize the need for a doctor's attention. Monmouth County Correctional Institutional Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987). In addition, "if unnecessary and wanton infliction of pain results as a consequence of denial or delay in the provision of adequate

medical care, the medical need is of the serious nature contemplated by the eighth amendment." Id.

A prison official acts with deliberate indifference to an inmate's serious medical needs when he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837 (1994). Thus, a complaint that a physician or a medical department "has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment..." Estelle v. Gamble, 429 U.S. 97, 106 (1976). For instance, a "medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice." Id., 429 U.S. at 107. "[A]s long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights." Brown v. Borough of Chambersburg, 903 F.2d 274, 278 (3d Cir. 1990). Further, a doctor's disagreement with the professional judgment of another doctor is not actionable under the Eighth Amendment. See White v. Napoleon, 897 F.2d 103, 110 (3d Cir. 1990). In sum, negligence, unsuccessful medical treatment, or medical malpractice

does not give rise to a §1983 cause of action, and an inmate's disagreement with medical treatment is insufficient to establish deliberate indifference. See Durmer v. O'Carroll, 991 F.2d 64, 69 (3d Cir. 1993).

Further, a non-physician defendant cannot be found deliberately indifferent under the Eighth Amendment because he or she fails to respond to the medical complaints of an inmate being treated by a prison physician, or because, as non-physicians, they defer to the medical judgment of the inmate's treating physicians. Id., 991 F.2d at 69. If, however, non-medical prison personnel had "a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner," liability may be imposed. Spruill, 372 F.3d 236.

A mere difference of opinion between the prison's medical staff and the inmate regarding the diagnosis or treatment which the inmate receives does not support a claim of cruel and unusual punishment. Farmer v. Carlson, 685 F. Supp. 1335, 1339 (M.D. Pa. 1988). See McCracken v. Jones, 562 F.2d 22, 24 (10th Cir. 1977); Smart v. Villar, 547 F.2d 112, 113 (10th Cir. 1976).

Additionally, if there is a dispute over the adequacy of the received treatment, courts have consistently been reluctant to second guess the medical judgment of the attending physician. Little v. Lycoming County, 912

F. Supp. 809, 815 (M.D. Pa.), aff'd, 101 F.3d 691 (3d Cir. 1996). The key question is whether the defendant has provided the plaintiff with some type of treatment, regardless of whether it is what the plaintiff desires. Farmer v. Carlson, 685 F. Supp. at 1339.

## B.   Abdullah's Eighth Amendment Claims Fail

Turning first to the decision to apply restraints after Abdullah refused to give staff his food tray and displayed signs of imminent violence by stating he would assault staff, and recognizing that summary judgment is appropriate only when the evidence, "viewed in the light most favorable to the plaintiff, will [not] support a reliable inference of wantonness in the infliction of pain." Brooks v. Kyler, 204 F.3d 102, 106 (3d Cir. 2000) (quoting Whitley, 475 U.S. at 322), we find that the initial decision to impose these restraints Plaintiff did not violate the Eighth Amendment. In this regard the Court is persuaded that the factors which govern use of force in this setting: "(1) 'the need for the application of force'; (2) 'the relationship between the need and the amount of force that was used'; (3) 'the extent of injury inflicted'; (4) 'the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of the facts known to them'; and (5) 'any efforts made to temper the severity of a forceful response'", id. at 106, which

all show that the use of these restraints was a prudent and necessary response to the display of imminent violence threatened by Abdullah. Thus, circumstances of the situation amply justified the use of force; the force applied was modest, given the dangers inherent in Abdullah's threatening conduct; the risk to staff and others posed by Abdullah's conduct was great; and Abdullah's verbal threat of assault demonstrated that it would have been extremely dangerous to further temper these security measures. Therefore, when considering the reasonableness of this authorized use of force, which must be "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," Graham v. Connor, 490 U.S. 386, 396-97 (1989), the Court finds that the actions of the prison officials " would still fall short of supporting a finding that prison officials acted 'maliciously and sadistically to cause harm.' " Fuentes v. Wagner, 206 F.3d 335, 346 (3d Cir. 2000).

Nor can Plaintiff sustain a deliberate indifference claim based upon the fact that he was held in restraints for a 24 hour period after his angry outburst. At the outset, the duration of this period of restraint–24 hours–simply does not implicate grave Eighth Amendment concerns. See, e.g., Key v. McKinney, 176 F.3d 1083, 1086 (8th Cir. 1999) (no Eighth Amendment violation where

30

prisoner handcuffed and shackled for 24 hours); Hunter v. Bledsoe, No. 10-CV-927, 2010 WL 3154963 (M.D.Pa. Aug.9, 2010) (ambulatory restraints used for 24 hours); Holley v. Johnson, No. 08-CV-629, 2010 WL 2640328 (W.D.Va. June 30, 2010) (ambulatory restraints used for 48 hours); Zimmerman v. Schaeffer, 654 F.Supp.2d 226, 232 (M.D.Pa. 2009)(19 hours or more in restraint chair); Moore v. Miller, No. 7:08CV00614, 2009 WL 113258 (W.D.Va. Jan.15, 2009) (26 hours); Keyes v. O'Brien, No. Civ. A. 7:06CV00437, 2006 WL 2125912 (W.D.Va. July 27, 2006) (no Eighth Amendment violation where prisoner placed in ambulatory restraints for 30 hours); Saleh v. Ray, No. Civ. A. 02–3214, 2003 WL 23484639, at * 6 (D.Kan. 2003) (24 hours in ambulatory restraints, no Eighth Amendment violation).

Moreover, the use of these restraints was both reasonable and necessary in light of Abdullah's threatening behavior. Indeed, it is undisputed that staff[6] used the restraints in a manner which was directly linked to the

---

[6]

To the extent that Plaintiff believes he should be allowed to amend his complaint to include the name of the members of the Force Team that participated in placing Plaintiff in restraints on April 17, 2011 (see Doc. 29), such amendment is unnecessary as there are no allegations in Plaintiff's complaint directed at any particular team member as using unnecessary force, and the undisputed record demonstrates that, not only did Plaintiff submit to the restraints, the only claimed injury related to the stringency of the restraints, which was immediately checked by medical personnel and (continued...)

penological goals of ensuring institutional safety. Furthermore, the care and attention which Plaintiff received from prison medical and correctional staff while in restraints belies any claim of deliberate indifference to his physical needs. In sum, the use of restraints here was in direct response to Plaintiff's threatening behavior. Those restraints were employed for a limited period of time, and were removed promptly once Plaintiff exhibited behavior which indicated that he no longer presented a threat to himself, fellow inmates, or staff. On these facts, a deliberate indifference claim fails, and the defendants are entitled to summary judgment in their favor.

In addition, we note that the use of these restraints was closely monitored by medical personnel and those medical staff observed no medical reason to remove these restraints. Since it is axiomatic that correctional staff cannot be held deliberately indifferent when they defer to medical personnel on medical matters, Durmer v. O'Carroll, 991 F.2d 64, 69 (3d. Cir. 1993), this fact also compels summary judgment in favor of Defendant Seeba on this deliberate indifference claim.

Finally, as to the medical staff named as Defendants, the undisputed

_____

[6](...continued)
determined to be adequate. Thus, such amendment would be futile. See Grayson v. Mayview State Hospital, 293 F.3d 103, 114 (3rd Cir. 2002).

factual record plainly shows that Plaintiff was assessed by medical staff for circulation, or other medical concerns, and none were apparent. Although, the record does demonstrate that during one of the wellness checks, staff noted that Plaintiff was manipulating the restraints, so as to cause swelling of the wrists. Plaintiff, however, refused to be counseled on the possible consequences of failing to comply with accepting medical treatment and the medical advice of moving his extremities. Additionally, aside from Plaintiff's conclusory allegation that Defendant George told Lt. Seeba to loosen Plaintiff's restraints (see Doc. 1, complaint), there is no evidence of record demonstrating that Defendant George, or any other medical staff member, at any time, recommended adjustment of Abdullah's restraints because of circulation or other medical concerns.

Moreover, following the removal of the ambulatory restraints, Plaintiff was afforded an extremely wide array of medical care, medication, testing and referrals to outside specialists, in order to determine, treat and repair his carpal tunnel syndrome on his left wrist and ulnar nerve transposition in his left arm. A condition that, once identified, was verified by the treating neurologist as an injury not consistent with an injury involving restraint application, given that the location is far above the restraint sites. Plaintiff

offers nothing to refute this. Thus, the record establishes meaningful efforts by the Defendants to provide Plaintiff with necessary medical care, and an attendant mental state that falls woefully short of deliberate indifference. As such, there is insufficient proof in the record for a fair-minded jury to conclude that the Defendants were deliberately indifferent to Plaintiff's medical needs. See Estelle v. Gamble, 429 U.S. 97, 106 (1976); Monmouth County Correctional Institution Inmates v. Lanzaro, 834 F.2d at 346; West v. Keve, 571 F.2d at 161. Indeed, the extent and quality of medical attention that the Defendants provided Plaintiff precludes a finding of deliberate indifference.

### C.   **Qualified Immunity**

Even if Abdullah had stated a colorable constitutional claim relating to his cell extraction, the Defendants would still be entitled to qualified immunity from these claims for damages. In order to establish a civil rights claim Abdullah must show the deprivation of a right secured by the United States Constitution or the laws of the United States. Satisfying these elements alone, however, does not guarantee that Abdullah is entitled to recover damages from these public officials. Government officials performing "discretionary functions," are insulated from suit if their conduct did not violate a "clearly established statutory or constitutional right[ ] of which a reasonable person

would have known." Wilson v. Layne, 526 U.S. 603, 609(1999); see also Pearson v. Callahan, 555 U.S. 223 (2009). This doctrine, known as qualified immunity, provides officials performing discretionary functions not only defense to liability, but also "immunity from suit." Crouse v. S. Lebanon Twp., 668 F.Supp.2d 664, 671 (M.D.Pa.2009) (Conner, J.) (citations omitted).

"Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. The protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact'." Pearson, 555 U.S. at 231.

Determinations regarding qualified immunity, and its application in a given case, require a court to undertake two distinct inquiries. First, the court must evaluate whether the defendant violated a constitutional right. Saucier v. Katz, 533 U.S. 194, 201–02 (2001), abrogated in part by Pearson, 555 U.S. 223; Curley v. Klem, 499 F.3d 199, 206 (3d Cir.2007); Williams v. Bitner, 455 F.3d 186, 190 (3d Cir.2006). If the defendant did not actually commit a constitutional violation, then the court must find in the defendant's favor.

Saucier, 533 U.S. at 201. If the defendant is found to have committed a constitutional violation, the court must undertake a second, related inquiry to assess whether the constitutional right in question was "clearly established" at the time the defendant acted. Pearson, 555 U.S. at 232; Saucier, 533 U.S. at 201–02. The Supreme Court has instructed that a right is clearly established for purposes of qualified immunity if a reasonable state actor under the circumstances would understand that his conduct violates that right. Williams, 455 F.3d at 191 (citing Saucier, 533 U.S. at 202).

In order to find that a right is clearly established, "the right allegedly violated must be defined at the appropriate level of specificity." Wilson, 526 U.S. at 615. The Supreme Court has explained that, at least in some cases, "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful." Hope v. Pelzer, 536 U.S. 730, 741 (2002) (quoting United States v. Lanier, 520 U.S. 259, 271 (1997) (internal quotation marks and citation omitted)). In some cases, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." Wilson, 455 F.3d at 191 (quoting Hope, 536 U.S. at 741).

The court is no longer required to conduct these two inquiries sequentially, Pearson, 555 U.S. at 239–40, and it may forego difficult constitutional issues and award qualified immunity to a defendant if it is apparent that the defendant did not violate rights that were clearly established at the time the defendant acted. Id. Where a court elects to address the alleged constitutional violations, however, the court's analysis of the merits for purposes of summary judgment merges with analysis of the deprivation of federal rights for purposes of qualified immunity. Gruenke v. Seip, 225 F.3d 290, 299–300 (3d Cir.2000); Crouse, 668 F.Supp.2d at 671; see also Grant v. City of Pittsburgh, 98 F.3d 116, 122 (3d Cir.1996) ("[C]rucial to the resolution of [the] assertion of qualified immunity is a careful examination of the record ... to establish ... a detailed factual description of the actions of each individual defendant (viewed in a light most favorable to the plaintiff).") Because qualified immunity entails a consideration of whether the law was clearly established at the time of a defendant's conduct, this defense, which focuses on the state of the law, presents a question of law for the court, and one which can often be resolved on summary judgment. See Montanez v. Thompson, 603 F.3d 243 (3d Cir.2010).

In the specific factual context of excessive force claims based upon

37

allegations relating to a prisoner's handcuffing, courts have acknowledged that, in certain instances, summary judgment is entirely appropriate. Gilles v. Davis, 427 F.3d 197, 207 (3d Cir.2005). With respect to these particular excessive force claims, courts agree that: "In these cases, summary judgment for an officer who claims qualified immunity is appropriate where, 'after resolving all factual disputes in favor of the plaintiff,[ ] the officer's use of force was objectively reasonable under the circumstances.' " Id.

Applying these benchmarks, the Court finds that the Defendants are entitled to qualified immunity in this case. The record does not evince anything that would have alerted the Defendants that their actions violated "clearly established statutory or constitutional right[ ] of which a reasonable person would have known." Wilson v. Layne, 526 U.S. 603, 609 (1999). Moreover, the duration of Abdullah's detention in restraints fell squarely within the 24 hour time frame which had previously and repeatedly been recognized as a discrete period of time which did not give rise to constitutional concerns. See, e.g., Key v. McKinney, 176 F.3d 1083, 1086 (8th Cir.1999) (no Eighth Amendment violation where prisoner handcuffed and shackled for 24 hours); Hunter v. Bledsoe, No. 10–CV–927, 2010 WL 3154963 (M.D.Pa. Aug.9, 2010) (ambulatory restraints used for 24 hours); Holley v. Johnson,

No. 08–CCV–629, 2010 WL 2640328 (W.D.Va. June 30, 2010) (ambulatory restraints used for 48 hours); Zimmerman v. Schaeffer, 654 F.Supp.2d 226, 232 (M.D.Pa.2009) (19 hours or more in restraint chair). Accordingly, Defendants are entitled to qualified immunity from damages in this case.

## V.    Conclusion

Based upon the undisputed facts of record, Defendants are entitled to summary judgment with respect to Plaintiff's claims of excessive force and denial of medical care. Additionally, Defendants' request for qualified immunity will be granted with respect to Plaintiff's claim of being subjected to unconstitutional conditions of confinement. An appropriate order shall issue.

s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

Dated: **September 29, 2014**
O:\Mannion\shared\MEMORANDA - DJ\CIVIL MEMORANDA\2013 MEMORANDA\13-1227-01.wpd